## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re LORDSTOWN MOTORS CORP. SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 1:21-cv-00604 LPS<br><br>(Consolidated with Case Nos. 1:21-cv-00724 and 1:21-cv-00910) |
| This Document Relates To:<br>    ALL ACTIONS | |

### CONSOLIDATED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT

Plaintiffs Daniel J. Cohen, David M. Cohen, Alicia Kelley, Herbert Stotler, Claude L. Patterson, and Evaristo Sarabia (together, "Plaintiffs"), by their attorneys, submit this Consolidated Verified Stockholder Derivative Complaint for (i) violations of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"); (ii) contribution for violations of §§ 10(b) and 21D of the Exchange Act; (iii) Breach of Fiduciary Duties; (iv) Insider Selling; and (v) Unjust Enrichment derivatively for the benefit of Nominal Defendant Lordstown Motors Corp. ("Lordstown," or the "Company").  Plaintiffs base their allegations on personal knowledge and, as to all other matters outside their personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class action *Rico v. Lordstown Motors Corp. et al*., No. 4:21-cv-00616, (the "Securities Class Action);[1] and (iii) review and analysis of

---

[1] *Palumbo v. Lordstown Motors Corp. et al.*, No. 4:21-cv-00633, *Zuod v. Lordstown Motors Corp. et al.*, No. 4:21-cv-00720, *Brury v. Lordstown Motors Corp. et al.*, No 4:21-cv-00760 were consolidated with *Rico* the United States District Court for the Northern District of Ohio on April 13, 2021.  *Rico*, ECF. No. 9.

press releases, news reports, analyst reports, industry reports, investor conference call transcripts and slides, and other information available in the public domain.

## I.      INTRODUCTION

1.      This is a stockholder derivative action brought on behalf of and for the benefit of Lordstown against certain of the Company's (and its predecessor's) officers and directors seeking to remedy their violations of the federal securities laws, breaches of fiduciary duty, and unjust enrichment.  Defendants' actions have caused substantial financial and reputational harm to Lordstown.

2.      Lordstown is an automotive company that develops and manufactures light duty electric vehicle ("EV") trucks targeted for sale to fleet customers. Its flagship vehicle is called "Endurance," an electric full-size pickup truck.

3.      DiamondPeak Holdings Corp. ("DiamondPeak") was a special purpose acquisition company ("SPAC")—sometimes called a "blank check" company—formed for the sole purpose of acquiring an existing business.  DiamondPeak, which had no commercial operations of its own, went public in its February 2019 initial public offering ("IPO") raising more than $250 million, with its shares trading on the NASDAQ stock exchange under the ticker symbol "DPHC."  At the time, DiamondPeak stated that it would "focus [its] search for a target business with a real estate related component" and "with an enterprise value of between $350 million and $2.0 billion."  Under the terms of its IPO, DiamondPeak was required to redeem all its publicly traded shares if it failed to complete a business combination within two years of the offering.

4.      With time running out on its two-year window to complete a business combination, DiamondPeak identified its acquisition target in the fall of 2020: Lordstown.  Founded in 2019, Lordstown sought to design, manufacture, and sell the first mass-produced, light duty electric pickup truck.  Shortly after founding, the Company acquired a recently shuttered six million

square-foot factory from General Motors in Lordstown, Ohio that had once employed more than 10,000 workers.  Lordstown Motors was therefore viewed by many as the savior of this Northern Ohio region after it promised to transform the Mahoning Valley into the epicenter of electric vehicle production, which it dubbed "Voltage Valley."   In June 2020, Lordstown revealed its flagship "Endurance" electric pickup truck in a highly publicized ceremony attended by then-Vice President of the United States Michael R. Pence.

5.      On August 3, 2020, DiamondPeak and Lordstown announced that they had entered into a merger agreement through which Lordstown would become a publicly traded company (the "Merger").  Upon closing of the Merger, DiamondPeak would be renamed "Lordstown Motors Corp." and would continue to be listed on the NASDAQ and trade under the new ticker symbol, "RIDE."  The Merger, however, would only close if it received the approval of the majority of DiamondPeak's voting shares.

6.      In connection with the Merger announcement, DiamondPeak and Lordstown trumpeted the reported 27,000 pre-orders for the Endurance, representing $1.4 billion in potential revenue, which they touted as evidence of the significant demand for the electric truck by fleet customers.  They also stated that the Endurance was on track for commercial production in the second half of 2021.

7.      Thereafter, DiamondPeak and Lordstown continued to promote the Merger.  For example, in a September 17, 2020 presentation to analysts and investors, they touted a "Working Prototype" and claimed that Lordstown had received "significant pre-orders" for about 40,000 trucks which represented "potential revenue sufficient to cover production into 2023." They also set forth a timeline for commercial production of the Endurance beginning in third quarter 2021.

8.      On October 8, 2020, DiamondPeak announced that it would hold a Special Meeting of its stockholders to vote on the proposed Merger on October 22, 2020.  Two weeks later, DiamondPeak shareholders approved the Merger at the Special Meeting.  On October 23, 2020, Lordstown and DiamondPeak issued a press release announcing the successful stockholder vote, the closing of the business combination, and that beginning on October 26, 2020, the combined company's shares would trade on the NASDAQ.

9.      Post-Merger, Lordstown continued to aggressively promote its business to bolster its ongoing efforts to raise additional capital.  In an interview published on October 26, 2020, just days after the stockholder vote, Lordstown's founder and then-Chief Executive Officer ("CEO") Stephen S. Burns ("Burns") bragged about the Company's 40,000 pre-orders, stating that he "was surprised that the truck has attracted so much attention this soon," and attributing the success to "a pent-up demand."

10.     On November 12, 2020, Lordstown filed a Registration Statement on Form S-1 with the SEC, in which the Company announced its intent to sell additional shares of Lordstown Class A common stock and warrants, raising an additional $182 million in capital.  The "Selling Shareholders"—including most of the Individual Defendants (defined below)—registered for sale more than $2.4 billion of their individual holdings of Lordstown common stock and warrants.

11.     On November 16, 2020, Lordstown issued a press release announcing that it "Remains on Track to Begin Production of the Lordstown Endurance in September 2021," and highlighting that the Company had now reached 50,000 pre-orders.  Several weeks later, on December 21, 2020, Lordstown claimed 80,000 pre-orders and reaffirmed that it was "on track" to commence production of the Endurance by September 2021.

4

12.     On January 11, 2021, Lordstown issued a press release announcing that it had "surpasse[d] 100,000 pre-orders for the Lordstown Endurance."  In this release, Defendant Burns stated: "[r]eceiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history . . . . Adding in the interest we have from federal, state, municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry."  This press release further provided that "Lordstown is now building the first Beta Endurance vehicles and is on track for start of production in September of this year."

13.     The following month, on February 23, 2021, Defendant Burns stated: "our initial foray is into fleets, and we have pre-sold 100,000 of these vehicles to various fleets across America.  So really a big appetite."  He again confirmed that production for the Endurance was set to begin in September.

14.     But then, on March 12, 2021, Lordstown's smooth ride came to a screeching halt. Analyst Hindenburg Research published a scathing report on Lordstown entitled: "The Lordstown Motors Mirage: Fake Orders, Undisclosed Production Hurdles, and a Prototype Inferno" (the "Hindenburg Report").[2]  As alleged in greater detail below, Hindenburg revealed that Lordstown has "no revenue and no sellable product," and wrote that the Company "has misled investors on both its demand and production capabilities."  The Hindenburg Report concluded that Lordstown's "orders are largely fictitious and used as a prop to raise capital and confer legitimacy," and that a former employee "explained how the company is experiencing delays and making 'drastic' design modifications, putting [Lordstown] an estimated 3-4 years away from production," rather than the Company being "on track" for a September 2021 production start.

---

[2] Available at https://hindenburgresearch.com/lordstown/ (last visited 8/25/2021).

5

15.     On this news, the price of Lordstown common stock crashed more than 16% in a single day, down from its March 11, 2021 closing price of $17.71 per share to a March 12, 2021 close of just $14.78 per share.  This drop represented more than $517 million in lost market capitalization.

16.     Then, on March 17, 2021, the Company held an earnings call on which Defendant Burns belatedly disclosed that Lordstown was being probed by the SEC.  The SEC's initial inquiry had occurred a full month earlier, on February 17, 2021, when Lordstown received a request for the voluntary production of documents and information relating to the Merger and the Company's claimed pre-orders for the Endurance truck.  On this news, Lordstown's stock price fell another 13%, erasing an additional $367 million in market capitalization.

17.     When interviewed on *CNBC* on the morning of March 18, 2021 before the opening of trading, Defendant Burns claimed that the Company had "never said we had orders," and admitted that the Company "[didn't] have a product yet," adding that "[b]y definition we can't have orders."  He added: "I don't think anybody thought we had actual orders.  That's just not the nature of this business."

18.     Then, on March 24, 2021, Hindenburg Research published some "behind the scenes" pictures of the Endurance truck breaking down, which were reportedly taken during the filming of an Endurance commercial during the summer of 2020.  One of the pictures, posted to Twitter, shows the Endurance loaded onto a tow truck.  Hindenburg added that "[a]n onlooker explained that the Endurance broke down on the road mid-shoot, with workers struggling to push it onto a truck before calling a tow truck."  In response, Lordstown's stock price fell nearly 10%, erasing an additional $213 million in stockholder value.

19.     On June 14, 2021, defendants caused the Company to issue a press release via Form 8-K filed with the SEC announcing that, "pursuant to mutual agreements with the Company, [Burns] resigned as the [CEO] of the Company and from the Company's [Board]."  The release further announced that "Julio Rodriguez [had] resigned as Chief Financial Officer of the Company."

20.     But the departure of the CEO and Chief Financial Officer did not stop senior executives from continuing to issue false and misleading statements.  In a June 17, 2021 press release, defendants caused the Company to admit that statements made at an Automotive Press Association online media event by Defendant Phil Richard Schmidt ("Schmidt") that the Company had "firm" and "binding" orders sufficient for limited production of the Endurance for 2021 and 2022 were categorically false.  The press release stated that "we have engaged in limited marketing activities and we have no binding purchase orders or commitments from customers."

21.     Finally, on July 15, 2021, defendants caused Lordstown to reveal in a regulatory filing that the United Stated Department of Justice ("DOJ"), acting through the United States Attorney's Office for the Southern District of New York, had also initiated an investigation into the Merger and pre-orders of vehicles.

22.     The Individual Defendants are responsible for making and/or allowing false and misleading statements, thereby misleading Company stockholders and investors, violating state and federal securities laws, and breaching their fiduciary duties.  As a direct result, Lordstown has suffered significant damage.  In addition to the SEC and DOJ investigations, the Company expended significant funds to compensating officers and directors who were breaching their fiduciary duties.  Lordstown now also faces the Securities Class Action alleging that the Company and Defendants Burns, Schmidt, Julio C. Rodriguez, and Michael Fabian violated Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  The cases seek to recover hundreds of millions of dollars on behalf of stockholders who purchased or acquired the common stock of Lordstown (or its predecessor company, DiamondPeak) between August 3, 2020 and March 24, 2021, inclusive.

23.      Due to the Lordstown Board of Directors' (the "Board") direct involvement in the wrongdoing, the substantial likelihood of liability its members face, and its members' lack of independence, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act.  Accordingly, Plaintiffs now bring this action to remedy the harm to Lordstown caused by Defendants' faithless actions.

24.      At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations because, among other things, the entire Board is beholden to Defendant Burns who nominated a majority of the directors on the Board and therefore would not take action against him.  As a result, a majority of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law.

## II.      JURISDICTION AND VENUE

25.      Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

26.      This Court has personal jurisdiction over each of the Defendants because each Defendant has expressly or implicitly consented to personal jurisdiction through, among other things, Lordstown's forum selection clause which requires that the sole and exclusive forum for a

stockholder derivative action is a Delaware state or federal court.  Additionally, each Defendant is either a Delaware corporation or an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

27.    Venue is proper in this jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) because Lordstown is a Delaware corporation, and this action is governed by a forum selection clause which requires that the sole and exclusive forum for a stockholder derivative action is a Delaware state or federal court.

## III.    PARTIES

### A.    Plaintiffs

28.    Plaintiffs Daniel J. Cohen and David M. Cohen are current stockholders of Lordstown and have continuously owned such shares in Lordstown (and its predecessor company, DiamondPeak), since at least August 3, 2020 and August 27, 2020, respectively.

29.    Plaintiff Alicia Kelley is a current stockholder of Lordstown and has continuously owned such shares since November 2020.

30.    Plaintiff Herbert Stotler is a current stockholder of Lordstown and has continuously owned such shares since November 2020.

31.    Plaintiff Claude L. Patterson is a current stockholder of Lordstown and has continuously owned such shares since October 2020.

32.    Plaintiff Evaristo Sarabia is a current stockholder of Lordstown and has continuously owned such shares since December 2020.

### B.     Nominal Defendant

33.     Nominal Defendant Lordstown is an automotive company founded for the purpose of developing and manufacturing light duty electric trucks targeted for sale to fleet customers. Lordstown is incorporated under the laws of the State of Delaware with its principal executive offices located at 2300 Hallock Young Road, Lordstown, Ohio 44481.

34.     Shares of Lordstown common stock trade on the NASDAQ stock exchange under the ticker "RIDE" on October 26, 2020.  Lordstown's predecessor company, DiamondPeak, traded on the NASDAQ under the ticker symbol "DPHC."

### C.     Individual Defendants

35.     Defendant Burns founded Lordstown in April 2019 and served as its Chairman of the Board and CEO from inception until his resignation on or about June 14, 2021.  Burns was also the founder and former CEO of Workhorse Group Inc. ("Workhorse Group"), from which Lordstown later licensed certain intellectual property of Workhorse Group's W-15 pickup truck for use in the design and development of the Endurance.  Burns is named as a defendant in the Securities Class Action that alleges he violated Sections 10(b) and 20(a) of the Exchange Act. Defendant Burns knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements. Defendant Burns also negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.  In 2020, Lordstown paid Burns a total salary of $269,266.  As of July 1, 2021, Burns beneficially owned 46,351,745 shares of Lordstown Class A common stock which was worth more than $479 million.

36.     Defendant Schmidt has served as Lordstown's President since November 2020 and Chief Production Officer from October 2019 until October 2020.  Schmidt is named as a defendant

in the Securities Class Action that alleges he violated Sections 10(b) and 20(a) of the Exchange Act.  Defendant Schmidt knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.  In 2020, Lordstown paid Schmidt a total salary of $412,305.  As of July 1, 2021, Schmidt beneficially owned 334,148 shares of Lordstown Class A common stock which was worth more than $3.4 million.  Additionally, on December 11, 2020 and February 2-3, 2021, while the price of Lordstown's common stock was artificially inflated by the Individual Defendants' false and misleading public statements and omissions, and while Schmidt was in possession of material, adverse nonpublic information, he sold 263,412 shares of personally held Lordstown stock at artificially inflated prices for proceeds of $6,383,710.

37.     Defendant Julio C. Rodriguez ("Rodriguez") served as Lordstown's Chief Financial Officer ("CFO") from September 2019 until on or about June 14, 2021.  Previously, he served in several executive roles for Workhorse Group from August 2013 to August 2019.  Rodriguez is named as a defendant in the Securities Class Action that alleges he violated Sections 10(b) and 20(a) of the Exchange Act.  Defendant Rodriguez knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.  In 2019 and 2020, Lordstown paid Rodriguez a base salary of $250,000 per year plus stock options and other equity compensation.  As of November 30, 2020, Rodriguez beneficially owned 568,437 shares of Lordstown Class A common stock which was worth $13.9 million.  Additionally, on February 4, 2021, while the price of Lordstown's common stock was artificially inflated by the Individual Defendants' false and misleading public statements and omissions, and while Rodriguez was in possession of material, adverse nonpublic information,

he sold 9,300 shares of personally held Lordstown stock at artificially inflated prices for proceeds of $251,100.

38.     Defendant Michael Fabian ("Fabian") serves as the Director of Stamping Operations of Lordstown since February 2020.  Fabian is named as a defendant in the Securities Class Action that alleges he violated Sections 10(b) and 20(a) of the Exchange Act.  Defendant Fabian knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's public communications.

39.     Defendant David T. Hamamoto ("Hamamoto") served as DiamondPeak's Chairman and CEO between November 2018 and October 2020, and has served as a director to its successor, Lordstown, since the Merger.  Defendant Hamamoto knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's (and its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements. Defendant Hamamoto also negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.  As of July 1, 2021, Hamamoto beneficially owned 4,229,135 shares of Lordstown Class A common stock and 1,826,396 warrants which were worth more than $64 million. Additionally, on October 22, 2020, while the price of Lordstown's common stock was artificially inflated by the Individual Defendants' false and misleading public statements and omissions, and while Hamamoto was in possession of material, adverse nonpublic information, he sold one million shares of personally held Lordstown stock at artificially inflated prices for proceeds of $16.38 million.

40.     Defendant Mark A. Walsh ("Walsh") served as a director of DiamondPeak beginning prior to its IPO until the Merger closed on October 23, 2020.  Walsh is a partner and co-

12

founder of Silverpeak, an alternative investment management firm that was part of a joint venture that controlled DiamondPeak's sponsor.  Defendant Walsh knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's (specifically its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements.  Defendant Walsh negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.  As of November 30, 2020, Walsh beneficially owned 1,896,960 shares of Lordstown Class A common stock and 802,832 warrants which were worth more than $53 million.  Walsh agreed to resign from DiamondPeak's board of directors upon the closing of the Merger.

41.     Defendant Andrew C. Richardson ("Richardson") served as a director of DiamondPeak beginning prior to its IPO until the Merger closed on October 23, 2020.   In connection with the Merger, Richardson received 88,357 founder shares of Class A common stock which were valued at more than $1.6 million at the time.  Defendant Richardson knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's (specifically its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements.  Defendant Richardson negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.  Richardson agreed to resign from DiamondPeak's board of directors upon the closing of the Merger.

42.     Defendant Steven R. Hash ("Hash") served as a director of DiamondPeak beginning prior to its IPO until the Merger closed on October 23, 2020.  In connection with the Merger, Hash received 88,357 founder shares of Class A common stock which were valued at more than $1.6 million at the time.  Defendant Hash knowingly, recklessly, or with gross

Case 1:21-cv-00604-SB   Document 25   Filed 08/27/21   Page 14 of 77 PageID #: 150

negligence made (or allowed to be made) improper statements in Lordstown's (specifically its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements. Defendant Hash negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger. Hash agreed to resign from DiamondPeak's board of directors upon the closing of the Merger.

43.     Defendant Judith A. Hannaway ("Hannaway") served as a director of DiamondPeak beginning prior to its IPO until the Merger closed on October 23, 2020.   In connection with the Merger, Hannaway received 88,357 founder shares of Class A common stock which were valued at more than $1.6 million at the time.  Defendant Hannaway knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's (specifically its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements.  Defendant Hannaway negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.  Hannaway agreed to resign from DiamondPeak's board of directors upon the closing of the Merger.

44.     Defendant Keith A. Feldman ("Feldman") has served as a Lordstown director and the Chair of the Board's Audit Committee since October 2020.  Defendant Feldman knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.  As of July 1, 2021, Feldman beneficially owned 234,645 shares of Lordstown Class A common stock which was worth more than $2.4 million.

45.     Defendant Jane Reiss ("Reiss") served as a director of (legacy) Lordstown from February 2020 until October 2020 and has served as a Company director and member of the

Board's Audit Committee since the Merger.  Defendant Reiss knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.  Defendant Reiss also negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.  In February 2020, in consideration of her service on (legacy) Lordstown's board of directors, Reiss was granted 2,500 stock options.  As of July 1, 2021, Reiss beneficially owned 83,822 shares of Lordstown Class A common stock which was worth more than $867,000.

46.     Defendant Dale G. Spencer ("Spencer") served as a director of (legacy) Lordstown from February 2020 until October 2020 and has served as a director of Lordstown since the Merger.  Defendant Spencer knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.  Defendant Spencer also negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.  In February 2020, in consideration of his service on (legacy) Lordstown board of directors, Spencer was granted 2,500 stock options.   As of July 1, 2021, Spencer beneficially owned 83,822 shares of Lordstown Class A common stock which was worth more than $867,000.

47.     Defendant Michael D. Gates ("Gates") has served as a Lordstown director since October 2020.  Defendant Gates knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.  As of July 1, 2021, Gates beneficially owned 10,101 shares of Lordstown Class A common stock which was worth more than $104,000.

48.     Defendant Mickey W. Kowitz ("Kowitz") has served as a Lordstown director since October 2020.  Defendant Kowitz knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.  As of July 1, 2021, Kowitz beneficially owned 10,060 shares of Lordstown Class A common stock which was worth more than $104,000.

49.     Defendant Angela Strand Boydston ("Strand Boydston") has served as a Lordstown director since October 2020 and Executive Chair of the Board since June 2021.  Defendant Strand Boydston knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.

50.     Defendant Martin J. Rucidlo ("Rucidlo") has served as a Lordstown director and a member of the Board's Audit Committee since October 2020.  Defendant Rucidlo knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Lordstown's SEC filings, press releases, and other public statements.  As of July 1, 2021, Rucidlo beneficially owned 12,535 shares of Lordstown Class A common stock which was worth more than $129,000.

51.     Defendants Burns, Schmidt, Rodriguez, and Fabian are the "Officer Defendants" or the "Securities Class Action Defendants."  Defendants Burns, Hamamoto, Walsh, Richardson, Hash, Hannaway, Feldman, Reiss, Spencer, Gates, Kowitz, Strand Boydston, and Rucidlo are the "Director Defendants."  Defendants Feldman, Reiss, and Rucidlo are the "Audit Committee Defendants."  Defendants Hamamoto, Walsh, Richardson, Hash, Hannaway, Burns, Reiss, and Spencer are the "Proxy Defendants."  The Officer Defendants and the Director Defendants are sometimes collectively referred to as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     DiamondPeak Goes Public as a SPAC and Acquires Lordstown

#### 1.     DiamondPeak

52.     DiamondPeak was a blank check company or "SPAC" formed under the laws of the State of Delaware on November 13, 2018 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.  DiamondPeak was led by Defendant Hamamoto, its CEO and Chairman. DiamondPeak's sponsor, DiamondPeak Sponsor LLC, was a joint venture between an entity controlled by Defendant Hamamoto (DHP SPAC Sponsor LLC) and an entity controlled by the principals of Silverpeak (SP SPAC Sponsor LLC), an alternative investment management firm, led by its partners, including Defendant Walsh.

53.     On January 18, 2019, DiamondPeak filed for its $250 million IPO.

54.     DiamondPeak's preliminary prospectus filed that day stated in part:

We have not selected any business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. We intend to focus our search for a target business with a real estate related component.

55.     DiamondPeak further stated that it was targeting a business "with an enterprise value of between $350 million and $2.0 billion."

56.     The preliminary prospectus disclosed that "[i]f we are unable to complete our business combination within 24 months, we will redeem 100% of the public shares at a per-share price, payable in cash . . . ."

57.     On February 27, 2019, the SEC declared effective DiamondPeak's registration statement for its IPO.

58.     On March 4, 2019, DiamondPeak announced that it had closed its IPO of 25 million units at $10 per unit, resulting in gross proceeds of $250 million.  Simultaneously with the closing of the IPO, DiamondPeak sold 4,666,667 warrants at a price of $1.50 per private placement warrant in a private placement, generating an additional $7 million in proceeds.  On March 18, 2019, in connection with the underwriters' election to partially exercise their over-allotment option, DiamondPeak sold an additional 3 million units and an additional 400,000 private placement warrants, generating another $30.6 million in proceeds.

59.     DiamondPeak's units were listed on the NASDAQ and commenced trading under the ticker symbol "DPHCU."  Each unit consisted of one share of the company's Class A common stock and one-third of one redeemable warrant, each whole warrant enabling the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share.

60.     Even after the IPO, Defendants Hamamoto and Walsh exerted significant control over DiamondPeak.  According to DiamondPeak's 2019 Form 10-K, which was filed on March 25, 2020, Defendants Hamamoto and Walsh beneficially owned 88.4% of DiamondPeak's Class B common stock (that is, 6,187,500 of 7,000,000 shares) as on March 20, 2020.  Hamamoto owned an additional one million Class A common shares of 28 million outstanding as of March 20, 2020.

### 2.     Lordstown

61.     Lordstown was founded in 2019 as a private company by Defendant Burns, the former CEO of Workhorse Group.

62.     On November 7, 2019, Lordstown became the owner of the recently shuttered General Motors plant located in Lordstown, Ohio, a 6.2 million square foot facility, after signing a sales agreement with automaker General Motors in May 2019.  The General Motors Lordstown assembly plant had employed more than 10,000 workers in the early 1990s, and 4,200 workers

who had manufactured the Chevrolet Cruze through early 2019. General Motors provided a $40 million loan to Lordstown so it could purchase and retool the plant.

63.     Lordstown touted itself as the savior of this Northeastern Ohio region after it promised to transform the Mahoning Valley (which was known as "Steel Valley") into the epicenter for electric vehicle production, which it dubbed "Voltage Valley."

64.     In March 2020, Lordstown paid Burns' former company, Workhorse Group, $12 million dollars for the licensing rights to the intellectual property of Workhorse Group's W-15 light-duty electric pickup truck. Lordstown intended on developing its own electric pickup truck based upon Workhorse's design. As part of the business deal, Workhorse Group was given a 10% equity stake in Lordstown.

65.     An April 21, 2020 blog post by Defendant Burns stated that Lordstown would begin delivering its Endurance electric pickup truck to commercial fleets in January 2021, after previously claiming to expect deliveries to begin in late 2020.

66.     On May 22, 2020, a *The Detroit Free Press* article entitled "GM's former plant in Lordstown will return to mass vehicle production, thousands of jobs" reported that Defendant Burns "expects to employ 4,000 to 5,000 people in the plant in the near future based on demand for electric vehicles." Defendant Burns provided a first-year projected volume of 20,000 trucks based upon initial interest, stating, "I think we'll have well, well north of the 20,000 well spoken for. The demand side is super strong, I am starting to worry we won't be able to make them fast enough."

67.     Lordstown unveiled the prototype of its flagship Endurance pickup truck during a live-stream event on June 25, 2020 from its Lordstown, Ohio headquarters to much fanfare, in a ceremony attended by Vice President Mike Pence. After riding inside an Endurance prototype,

19

Pence declared "the best days in Lordstown and Ohio and America are yet to come" and "Endurance isn't just the name of the pickup truck, endurance describes the character of the people of the Mahoning Valley."

68.     Lordstown claimed that the Endurance's use of an in-wheel hub motor design would improve performance, efficiency, and safety, while providing a significant reduction in total cost of ownership.  Further, Lordstown claimed to be the only manufacturer of full-size electric pickup trucks focused exclusively on the large commercial fleet market and that it expected to be the first to come to market with the innovative hub motor design.  At the time, Lordstown stated that production would begin in early 2021 with deliveries commencing later that year.  It also claimed to have a full year's worth of pre-orders on its books.

69.     A July 31, 2020 article published at *AutoTrends.org* entitled "About the 2021 Lordstown Endurance" noted that the June 25, 2020 "news conference was scarce on tech details" about the truck and matters such as charging times, payload, available trims, and interior remained unknown.  The article reported that Lordstown was targeting fleet buyers who were required "to purchase at least five trucks with a $1,000 refundable deposit each" and that Lordstown would begin manufacturing the truck in the summer of 2021.

### 3.     DiamondPeak Acquires Lordstown

70.     On August 3, 2020, DiamondPeak announced that it had entered into a definitive agreement for a business combination with Lordstown, which would result in Lordstown becoming a publicly traded company.  The transaction was described as follows:

**Transaction Overview**

The business combination values Lordstown at an implied $1.6 billion pro forma equity value, at the $10.00 per share PIPE price and assuming minimal redemptions by DiamondPeak stockholders. The boards of directors of both DiamondPeak and Lordstown have unanimously approved the proposed transaction, which is expected to be completed in the fourth quarter of 2020, subject to, among other things, the

20

approval by DiamondPeak's stockholders and satisfaction or waiver of the other conditions stated in the definitive documentation.

71.    On October 8, 2020, DiamondPeak announced that it would hold a Special Meeting of its stockholders to vote on the proposed Merger.  DiamondPeak's board of directors did not obtain a third-party valuation or fairness opinion in connection with their recommendation that stockholders approve the Merger.

72.    On October 22, 2020, DiamondPeak announced that at the Special Meeting, DiamondPeak's stockholders voted to approve all stockholder proposals necessary to complete the Merger, which would close on October 23, 2020.

73.    An article published on *Freightwaves.com* that same day entitled "SPAC shareholders approve Lordstown Motors reverse merger" noted that the quick stockholder vote was quite unusual:

> The deal went from announcement on Aug. 3 to Thursday's vote in about 11 weeks. That is fast even by special purpose acquisition company (SPAC) standards. Due diligence by the shell company of its target and [SEC] review typically take four to six months.

74.    Additionally, according to DiamondPeak's October 8, 2020 Schedule 14A, DiamondPeak's board of directors did not obtain a third-party valuation or fairness opinion in connection with their recommendation that stockholders approve the Merger.

75.    On October 23, 2020, Lordstown and DiamondPeak announced the closing of the business combination and that beginning on October 26, 2020, DiamondPeak would change its name to "Lordstown Motors Corp." and its shares would begin trading on the NASDAQ under the new ticker symbol "RIDE."  Upon closing of the Merger, each legacy share of DiamondPeak was converted into 55.8817 shares of Lordstown Series A common stock and options to purchase DiamondPeak common stock were converted into options to purchase Class A shares of Lordstown common stock.

### B.     The Undisclosed Truth About Lordstown's Business

76.     On March 12, 2021, the Hindenburg Report stated that, among other things, "Lordstown is an electric vehicle SPAC with no revenue and no sellable product, *which we believe has misled investors on both its demand and production capabilities*."[3]  The Hindenburg Report continued, "the [C]ompany has consistently pointed to its book of 100,000 pre-orders as proof of deep demand for its proposed EV truck.  Our conversations with former employees, business partners and an extensive document review show that *the [C]ompany's orders are largely fictitious and used as a prop to raise capital and confer legitimacy*."

77.     Accordingly, between at least August 2020 and March 2021, numerous statements made by and on behalf of Lordstown (and its predecessor, DiamondPeak) were materially false and misleading when made because of the failure to disclose the following true facts about the Company's business, operations, and prospects (as described in greater detail at ¶¶ 118-129, 137, below):

> (a)     Lordstown greatly overstated potential demand for the Endurance pickup truck because, among other things, the number of Endurance pre-orders was largely fictitious, significantly inflated, and reflected "pre-orders" by customers lacking the intent and/or means to purchase its trucks;

> (b)     Lordstown overstated and misrepresented its pre-orders in order to raise capital, confer legitimacy, and provide investors with an overstated and false sense of confidence in the Company's prospects;

> (c)     Lordstown faced considerable undisclosed design, performance, reliability, and production obstacles that would continue to delay production and delivery of the Endurance for potentially years beyond the third quarter of 2021; and

> (d)     as a result of the foregoing, statements by and on behalf of Lordstown concerning its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis when made.

---

[3]  Unless otherwise noted, all emphasis is added in materials quoted in this Complaint.

### C.    The Individual Defendants Made a Series of Improper Public Statements

78.    Beginning on or before August 3, 2020 and continuing until at least March 24, 2021, the Individual Defendants made, allowed the Company (or its predecessor) to make, and/or failed to correct improper statements in Lordstown's SEC filings, press releases, and other public statements concerning the Company's business, operations, and prospects.

79.    On August 3, 2020, Lordstown and DiamondPeak jointly announced that they had entered into a definitive merger agreement.  DiamondPeak filed a Form 8-K concerning the Merger announcement with the SEC, attaching the agreement and plan of merger, a form subscription agreement, the August 3, 2020 joint press release announcing the Merger, the August 3, 2020 investor slide presentation, the transcript from the August 3, 2020 joint conference call, and a script from an Endurance commercial.  The Form 8-K specifically noted: "[t]he Company [DiamondPeak] and its directors and executive officers may be deemed to be participants in the solicitation of proxies from the stockholders of the Company in respect of the Merger. . . . [Lordstown] and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of the Company in connection with the Merger."

80.    The August 3, 2020 joint press release provided, in relevant part, that the transaction valued Lordstown "at an implied $1.6 billion pro forma equity value," and that the transaction was expected to deliver approximately $675 million in gross proceeds.  It also stated that the boards of directors of DiamondPeak and Lordstown had both "unanimously approved the proposed transaction," which was expected to close in the fourth quarter of 2020, subject to the approval by DiamondPeak's stockholders.  The announcement included the following quote by Defendant Burns:

> We are thrilled with the opportunity to build [Lordstown] into a top-tier electric truck company that is highly differentiated from the competition. We are uniquely positioned to be a leader in the industry, with our first vehicle, the revolutionary

Lordstown Endurance. Our all-electric full-size pickup truck delivers the equivalent of 75 miles per gallon and has been systematically engineered and competitively priced specifically for the large commercial fleet market, which includes companies in manufacturing, contracting, utilities, transportation and delivery, and agriculture, among others. ***Since its unveiling just over a month ago, the Endurance has been met with enthusiastic support, and to date, we have secured $1.4 billion of pre-orders.*** Our platform is rooted in sustainability, and the entire Lordstown team is committed to ensuring we contribute to a healthier planet for generations to come.

81.     The August 3, 2020 joint press release also included the following quote by Defendant Hamamoto:

We have evaluated hundreds of companies for more than a year and Lordstown stood out as a differentiated, high growth company at the confluence of electric vehicles and light-duty trucks, two highly valuable areas of focus and tremendous opportunity in the automotive sector. Lordstown's top-tier management team, led by Steve Burns, has captured a clear lane of customers in the fleet market. ***The team's vast experience and track-record in launching both traditional and electric vehicles, as well as the company's strong strategic relationships, provides Lordstown with a unique competitive advantage and positions the company to achieve its milestone of commencing production of the Endurance in the second half of 2021***.

82.     This August 3, 2020 joint press release further provided that "Lordstown unveiled the prototype of its flagship Endurance pickup truck on June 25, 2020, and ***to date, has received more than 27,000 pre-orders for the vehicle representing over $1.4 billion of potential revenue, primarily from commercial fleet customers.***"

83.     Lordstown and DiamondPeak also held an analyst and investor conference call on August 3, 2020 to further promote the proposed business combination.  On the conference call, Defendant Hamamoto stated that the significant pre-orders for Endurance demonstrated the robust demand for the truck.  He stated:

***Lordstown has attracted a clear lane of customers in the commercial fleet segment of the market, as evidenced by its 1.4 billion dollars of pre-orders to-date***, with a product that has a significant total cost of ownership advantage over competitors in both traditional and electric trucks, supports sustainable clean energy, and has a simple design that provides a robust, safe and stable ride.

Defendant Burns similarly touted Lordstown's pre-orders as evidence of significant demand:

We officially unveiled the Endurance in late-June. ***The Endurance was met with great excitement and acclaim, and we now have garnered significant demand with pre-orders totaling approximately 27,000 vehicles since inception, representing more than 1.4 billion dollars of potential revenue. We hear from many fleets who cannot wait to get their hands on the Endurance***. The electric vehicle market is expected to grow significantly the next decade, underlying our expectations of selling more than 100,000 vehicles per year by 2024.

Burns also stated on the call that Lordstown expected "full production" to commence "in early 2021 ahead of anticipated deliveries later that year."

84.     During the conference call, Lordstown and DiamondPeak presented slides which were later made available to all investors in DiamondPeak's Form 8-K filing with the SEC.  The August 3, 2020 slides highlighted Lordstown's purported pre-order customers including Clean Fuels Ohio, Duke Energy, FirstEnergy, Grid-X, ServePro, Summit Petroleum Inc., and Turner Mining Group:



85.     The August 3, 2020 slides repeated the claim that demand for the Endurance was "proven with pre-orders covering the first year of production":



86.     The August 3, 2020 slides further boasted that "existing pre-orders have been achieved with minimal marketing costs," suggesting that the orders were largely driven by pent-up demand from the "Fleet Market":



87.     The August 3, 2020 slides also touted a "Working Prototype" and showed that Lordstown had received "Significant Pre-Orders" of about 27,000 pre-sales for the Endurance

which represented "potential revenue sufficient to cover 2021 production and into 2022," and set forth a timeline for commercial production beginning in Q3 2021:



88.    The August 3, 2020 slides included a "Financial Overview" which contained "Summary Financials" reiterating that the Company was set to sell an estimated 2,200 units in 2021 for $118 million in revenues, 31,600 units in 2022 for $1.69 billion in revenues, 65,000 units in 2022 for $3.476 billion in revenues, and 107,000 units in 2024 for $5.776 billion in revenues:



89.     The August 3, 2020 statements concerning Lordstown's pre-orders, pre-order customers, and the demand for its Endurance pickup truck, along with the statements concerning its production timeline and sales estimates, were false and materially misleading for the reasons set forth at ¶¶ 77(a)-(d), above.

90.     On August 24, 2020, DiamondPeak filed its preliminary proxy statement on Schedule 14A with the SEC, in which DiamondPeak's board of directors requested that stockholders vote in favor of the Merger.  The filing touted Lordstown's 27,000 pre-orders from fleet operators and repeated that the Company expected full production to begin in 2021, with 2,200 vehicles produced and sold that year.

91.     On September 17, 2020, DiamondPeak and Lordstown hosted an analyst day with select Wall Street firms to provide an overview of Lordstown's business and discuss historical and projected financial performance and various other matters, including recent developments with Lordstown and the electric vehicle industry generally.  During the presentation, the companies exhibited slides which were later made available to all investors in a DiamondPeak SEC filing.

92.     The September 17, 2020 slides were substantially similar to the August 3, 2020 slides and repeated the claim that demand for the Endurance was "proven with pre-orders covering the first year of production."  They also highlighted Lordstown's purported pre-order customers including Clean Fuels Ohio, Duke Energy, FirstEnergy, Grid-X, ServePro, Summit Petroleum Inc., and Turner Mining Group.  The slides further boasted of "$2.0bn+ of Existing Pre-Orders" that "have been achieved with minimal marketing costs," indicating that the orders were largely driven by pent-up demand from the "Fleet Market."

93.     The September 17, 2020 slides also touted a "Working Prototype" and showed that Lordstown had now received "Significant Pre-Orders" of about 40,000 pre-sales for the Endurance

which represented "potential revenue sufficient to cover production into 2023," and set forth a timeline for commercial production beginning in Q3 2021.   The slides included a "Financial Overview" which contained "Summary Financials" reiterating that the Company was on track to sell an estimated 2,200 units in 2021 for $118 million in revenues, 31,600 units in 2022 for $1.69 billion in revenues, 65,000 units in 2022 for $3.476 billion in revenues, and 107,000 units in 2024 for $5.776 billion in revenues.

94.     The August 24, 2020 and September 17, 2020 statements set forth above concerning Lordstown's working prototype, commercial production and sales targets, its pre-orders, pre-order customers, and the demand for its Endurance pickup truck were false and materially misleading for the reasons set forth at ¶¶ 77(a)-(d), above.

95.     On September 18, 2020, DiamondPeak supplemented its proxy statement by filing a Form DEFA 14A with the SEC.   The supplement to the proxy statement stated "DiamondPeak, Lordstown and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from the holders of common stock in respect of the proposed transaction."   The supplement included a September 1, 2020 *The Detroit News* article where Defendant Burns touted 40,000 pre-orders and the slides from the September 17, 2020 investor presentation, as described above.

96.     On October 8, 2020, DiamondPeak filed its definitive proxy statement on Schedule DEFM14A with the SEC.   The proxy statement claimed that while Lordstown had only "engaged in limited marketing activities," it already had pre-orders for more than 38,000 vehicles, primarily from fleet purchasers.   It also contained a "Risk Factor" which stated, in part: "To date, Lordstown has engaged in limited marketing activities and Lordstown has no binding contracts with customers.   The non-binding pre-orders that Lordstown has signed did not require customer

29

deposits and may not be converted into binding orders or sales." The proxy statement further stated that that the Company "achieved several key milestones" to "commencing commercial production and sales," and that the Company anticipated commencing full production in 2021, "with a target of 2,200 vehicles produced and sold in the year." DiamondPeak's board of directors also expressly recommended that stockholders vote in favor of the Merger.

97.    The October 8, 2020 statements concerning Lordstown's ability to meet its commercial production and sales milestones, its pre-orders, and the demand for its Endurance pickup truck were false and materially misleading for the reasons set forth at ¶¶ 77(a)-(d), above. Additionally, the purported "Risk Factor" misrepresented and failed to disclose the true risks associated with Lordstown's reported pre-orders because, among other things, the Company had secretly paid consultants for each pre-order received such that they were highly motivated to and did accumulate largely fictitious pre-orders from "customers" lacking the intent and/or means to purchase the trucks.

98.    On October 23, 2020, Lordstown and DiamondPeak issued a press release announcing the closing of the business combination, and that beginning on October 26, 2020, Lordstown shares would commence trading on the NASDAQ under the symbol "RIDE," with Lordstown warrants trading under the symbol "RIDEW." The press release stated, in part:

> "We are proud of this momentous occasion. Electrification of the automotive industry is at an inflection point, and this transaction helps us play our part in this transformation," commented [Burns], Founder and [CEO] of [Lordstown]. "At Lordstown, we have built a differentiated company, and we look forward to combining our EV startup culture with the infrastructure and assets we already have in place in order to successfully achieve our production milestones."
>
> [Lordstown], which unveiled the prototype of its flagship Endurance pickup truck in June 2020, *remains on pace to commence commercial production in the second half of 2021 at its plant in Lordstown, Ohio*. The Endurance's revolutionary use of an in-wheel hub motor design is expected to deliver superior performance, efficiency, and safety, while providing a significant reduction in total cost of ownership for commercial fleet owners. 'We have a near production-ready plant

and approximately $675 million in proceeds from this transaction, which is more than enough funding to get us through initial production,' continued [Burns].

99.     In an interview published by Youngstown Publishing Co. in *The Business Journal* on October 26, 2020, Defendant Burns highlighted that the Company's beta vehicles were "nearly production ready" and would launch into full production by September 2021.  Defendant Burns also noted that the Company had received 40,000 pre-orders and that he "was surprised that the truck has attracted so much attention this soon," attributing the success to "a pent-up demand."

100.     The October 23 & 26, 2020 statements concerning Lordstown's ability to meet its commercial production milestones, its pre-orders, and the demand for its Endurance pickup truck were false and materially misleading for the reasons set forth at ¶¶ 77(a)-(d), above.

101.     On November 12, 2020, Lordstown filed its preliminary prospectus and registration statement on Form S-1 with the SEC, which was amended by the Company's December 1, 2020 Form S-1/A (together with the Prospectus dated December 4, 2020, the "Registration Statement"), in which the Company registered to sell (i) 5,066,667 shares of Class A common stock that were issuable upon the exercise of private placement warrants and (ii) 9,333,333 shares of Class A common stock that were issuable upon the exercise of certain public warrants, with expected proceeds to the Company of approximately $182.1 million.

102.     In the Registration Statement, Lordstown also registered for resale 143,666,024 shares of Class A common stock by the "Selling Shareholders," including Defendants Burns (46,351,745 shares), Schmidt (72,778 shares), Rodriguez (43,380 shares), Hamamoto (4,229,135 shares and 1,826,396 warrants), Walsh (1,896,960 shares and 802,832 warrants), Richardson (88,357 shares), Hash (88,357 shares), Hannaway (88,357 shares), Feldman (234,645 shares and 91,613 warrants), Gates (10,101 shares), Kowitz (10,060 shares), and Rucidlo (7,535 shares). Climb2Glory LLC, which was paid to gather pre-orders and later took a stake in Lordstown,

registered 62,628 shares for resale, which were valued at more than $1.4 million on December 4, 2020 when the Registration Statement was declared effective.  Some or all of the securities registered on behalf of the Selling Shareholders had been issued pursuant to private placements and, in any event, were not freely tradeable absent SEC registration or an applicable exemption. Lordstown would not receive any proceeds from the sale of these shares.

103.    The Registration Statement, which was signed by Defendants Burns, Rodriguez, Hamamoto, Feldman, Reiss, Spencer, Gates, Kowitz, Strand Boydston, and Rucidlo, claimed that Lordstown, which had only "engaged in limited marketing activities," now had ***pre-orders for more than 50,000 vehicles***, primarily from fleet purchasers.  Lordstown also claimed to have built "an operational prototype" of the Endurance and that it was "targeting commencement of commercial production of the Endurance and initial sales in the second half of 2021."  Lordstown's Form S-1 also stated that the Company "achieved several key milestones" to "commencing commercial production and sales," and that the Company anticipated commencing full production in 2021 "with a target of 2,200 vehicles produced and sold in the year."

104.    The statements in the Registration Statement concerning Lordstown's operational prototype, its limited marketing activities, commercial production and sales targets, its pre-orders, and the demand for its Endurance pickup truck, were false and materially misleading for the reasons set forth at ¶¶ 77(a)-(d), above.

105.    On November 16, 2020, Lordstown issued a press release providing a business update.  In this release, Lordstown announced that it "Remains on Track to Begin Production of the Lordstown Endurance in September 2021."  The Company also detailed several "[n]otable developments," including:

•    **[Lordstown] has received approximately 50,000 non-binding production reservations** from commercial fleets for its Lordstown all-electric

> pickup truck, with an average order size of approximately 500 vehicles per fleet. This figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders, such as federal, state and municipal governments, and military fleets. Deliveries of the Lordstown Endurance are expected to begin in September 2021, with full production ramping up throughout 2022.

(emphasis in original).

106.    On November 16, 2020, *Reuters* published a report entitled "Lordstown Motors says electric pickup ***launch 'on track' for fall 2021***," that included a picture of U.S. President Donald Trump "inspecting" the Endurance on the South Lawn of the White House accompanied by Defendants Fabian and Schmidt. The *Reuters* report quoted "Startup Lordstown [stating that] it ***remained 'on track'*** to begin building electric pickup trucks next September at a former General Motors Co. plant in northeastern Ohio." The *Reuters* report further represented that "[t]he company said it had received ***50,000 non-binding reservations*** for the new truck." A transcript of the President's remarks listed Defendants Burns, Schmidt, and Fabian being present and included comments by Defendants Burns and Schmidt. Defendant Schmidt stated in pertinent part that "our truck [is] a world-class vehicle. ***We can't wait to launch it this year coming***." In response to the President's inquiry: "[Y]ou'll make how many a year when you get it going?" Defendant Burns replied: "Well, ***we'll make north of 100,000 once we get going***."

107.    In an interview on CNBC's *Mad Money* the following day, on November 17, 2020, Defendant Burns declared "we sell to commercial fleets. That's our first customer. And like I said, we've already got 50,000 pre-orders." Burns went on to say that most of the orders were signed by the CEOs of large firms – "so very serious orders."

108.    On December 4, 2020, the SEC declared Lordstown's Registration Statement effective.

109.     On December 21, 2020, Lordstown announced that it received ***80,000 pre-orders*** for the Endurance and that the Company remained on track to begin production of the Endurance in September 2021.  In a Tweet promoting the news, the Company declared, "we have hit a new milestone."

110.     The November 16 & 17, 2020 and December 21, 2020 statements concerning Lordstown's commercial production and deliveries, its pre-orders, and the demand for its Endurance pickup truck were false and materially misleading for the reasons set forth at ¶¶ 77(a)-(d), above.

111.     On January 11, 2021, Lordstown issued a press release announcing that it had "surpasse[d] ***100,000 pre-orders*** for the Lordstown Endurance," wherein Defendant Burns stated: "[r]eceiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history . . . . Adding in the interest we have from federal, state, municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry."  The press release further provided that "Lordstown is now building the first Beta Endurance vehicles and is on track for start of production in September of this year."

112.     On January 28, 2021, Lordstown issued another press release wherein it provided business updates and stated that the Company was "Prepar[ing] Ohio Factory to Begin Building Betas Next Month."  Defendant Burns stated in the press release that "[w]e are hard at work in the factory preparing to begin Beta builds in the coming weeks," and that "[w]ith this step on the horizon, we remain on track to meet our September start-of-production timeline while continuing to see indicators of strong demand for an all-wheel drive, full-size electric pickup truck with 250 miles of range from commercial, government and military fleets."

113.    On February 17, 2021, Lordstown issued another press release announcing that it had entered the Endurance Beta skateboard in the 2021 SCORE International San Felipe 250, part of the SCORE World Desert Championship race series.  In this release, the Company stated that "[a]fter successful prototype and Alpha builds, Lordstown is now building the first Beta Endurance vehicles and is on track for start of production in September of this year."

114.    The January 11 & 28, 2021 and February 17, 2021 statements concerning Lordstown's commercial production timeline, its pre-orders, and the demand for its Endurance pickup truck were false and materially misleading for the reasons set forth at ¶¶ 77(a)-(d), above.

115.    Also, on February 17, 2021, Lordstown received a non-public request from the SEC for the voluntary production of documents and information, including relating to the Merger and the pre-orders of the Company's Endurance pickup truck.  ***Lordstown did not publicly disclose the SEC's inquiry***.  The Individual Defendants' failure to disclose the SEC investigation rendered their previous statements concerning the Merger and the Company's pre-orders materially misleading.

116.    On February 23, 2021, in an interview with *Yahoo! Finance Live*, Defendant Burns stated: "[o]ur initial foray is into fleets, and ***we have pre-sold 100,000 of these vehicles*** to various fleets across America – really a big appetite."  He continued: "[y]ou've got a fleet using a 17-mile per gallon pickup truck for the last 30 years and we come out with one that gets the equivalent of 75 miles per gallon.  There is a lot of demand and excitement about it."  This article further provided that "Burns said production for the Endurance will begin in September.  That will make the Endurance the first all electric pickup truck on the market."

117.    The February 23, 2021 statements concerning Lordstown's commercial production timeline, its pre-orders, and the demand for its Endurance pickup truck were false and materially

misleading for the reasons set forth at ¶¶ 77(a)-(d), above.  Additionally, Defendants' failure to disclose the SEC investigation rendered the statements concerning Lordstown's commercial production timeline, its pre-orders, and the demand for its Endurance pickup truck incomplete and materially misleading.

**D.      The Truth Emerges**

118.     On March 12, 2021, investment analyst Hindenburg Research, which specializes in forensic financial research, published the Hindenburg Report.

119.     The Hindenburg Report summarized the findings set forth in its detailed report as follows:

(a)      "Lordstown is an electric vehicle SPAC with no revenue and no sellable product, which we believe has misled investors on both its demand and production capabilities."

(b)      "The [C]ompany has consistently pointed to its book of 100,000 pre-orders as proof of deep demand for its proposed EV truck.  Our conversations with former employees, business partners and an extensive document review show that the [C]ompany's orders are largely fictitious and used as a prop to raise capital and confer legitimacy."

(c)      "For example, Lordstown recently announced a 14,000-truck deal from E Squared Energy, supposedly representing $735 million in sales.  E Squared is based out of a small residential apartment in Texas that doesn't operate a vehicle fleet."

(d)      "Another 1,000-truck, $52.5 million order comes from a 2-person startup that operates out of a Regus virtual office with a mailing address at a UPS Store.  We spoke with the owner who acknowledged it won't actually order any vehicles, instead describing the 'pre-order' as a mere marketing relationship."

(e)      "Yet another firm that is supposedly set to buy 500 trucks from Lordstown told us: '…The letters of interest are non-binding.  It's not like you'd obligate yourself to a pre-order or that you would contractually bind yourself to buying this truck.  That's not what they are.'"

(f)      "Lordstown CEO [Burns] has called these arrangements 'very serious orders'.  The actual customer agreements, which we present for the first time today, require no deposit and are non-binding.  Many of the supposed

customers do not operate fleets nor do many have the means to actually make the stated purchases."

(g)    "Former employees and litigation records reveal that in order to raise capital and confer credibility, [Burns] began paying consultants for every truck pre-order as early as 2016 while he was serving as CEO at Workhorse."

(h)    "Later, heading into Lordstown's eventual go-public transaction in 2020, a small consulting group called Climb2Glory was paid to generate pre-orders. Climb2Glory openly described the purpose behind the pre-order game: 'the faster the pre-orders arrived, the greater investors' confidence would be in the company and the faster funds would flow in.'"

(i)    "One [C]ompany rep that committed to buy 40 trucks through Climb2Glory told us: '…I'm not committed to anything, not to buying a single vehicle. I committed to consider buying vehicles. I'd have a lot of questions before I commit to anything.'"

(j)    "Others had similar remarks. 'The commitment of that size (15) is totally impossible,' a representative for the City of Ravenna told us about its pre-order. We document numerous other 'customers' that disclaim any intent to actually purchase vehicles."

(k)    "Multiple former senior employees who have worked with Lordstown Founder & CEO [Burns] openly described him as a 'con man', or a 'PT Barnum' figure. One senior employee told us that, while working with Steve for a couple of years, they saw more questionable and unethical business practices than they had seen in their entire career."

(l)    "Despite being allowed to resign from Workhorse, former senior employees described how Burns was pushed out of his old company by the board for wasting R&D money and missing promised deadlines. He then launched Lordstown months later."

(m)    "Despite claims that Lordstown will be producing vehicles by September, a former employee explained how the [C]ompany is experiencing delays and making 'drastic' design modifications, putting them an estimated 3-4 years away from production. For example, in mid-January the company 'totally switched from a plastic exterior to aluminum,' we were told."

(n)    "Despite claims that battery packs would be manufactured in-house, we were told that the equipment is months away from arriving, let alone being put into a production environment. In the meantime, we were told that battery packs are being put together by hand."

(o)    "Former employees also shared that the company has completed none of its needed testing or validation, including cold weather testing, durability

37

testing, and Federal Motor Vehicle Safety Standards (FMVSS) testing required by the [National Highway Traffic Safety Administration]."

    (p)    "In January 2021, Lordstown's first street road test resulted in the vehicle bursting into flames 10 minutes into the test drive. We share copies of the 911 call and a police report we received through FOIA requests."

    (q)    "Lordstown only went public in October 2020, but in that brief time, executives and directors have unloaded ~$28 million in stock. We think it bodes poorly when executives unload stock in a company with no actual product that claims to be on the cusp of mass-production."

120.    Hindenburg Report further exposed that:

Our research has revealed that Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles. According to former employees and business partners, CEO [Burns] sought to book orders, regardless of quality, purely as a tool to raise capital and confer legitimacy. In addition, we show how, in desperation to claim there was demand for the proposed vehicle, [**Burns] paid for customers to book valueless, non-binding pre-orders**. (Emphasis in original).

121.    The Hindenburg Report quoted a former sales representative for the Lordstown Endurance, who stated:

You're right to have some apprehension. I think the way it's being communicated especially to the media is probably not accurate. Everywhere I read is pre-orders, pre-orders, pre-orders. **There's no such thing as a preorder. What they're doing is getting letters of intent and there is no commitment whatsoever.** I could commit to 100,000 pre-orders or reservations but I have no commitment, no financial commitment, no nothing I hope they can get all 100,000 of them but I think that's extraordinarily unlikely. (Emphasis in original).

122.    The Hindenburg Report further stated that Lordstown "hired small consulting group Climb2Glory, which was to receive $50 per truck pre-order, according to former employees." It further noted that "Climb2Glory boasts on its own website how it was key in helping Lordstown generate pre-orders faster in order to use the orders as a capital raising tool":



123.    The Hindenburg Report also included a quote from Climb2Glory's managing partner, Pat Mangin, from a phone interview: "[b]ecause of the letters of intent from Climb2Glory and some marketing, Diamond Group came to the table and they did the reverse merger.  So our role was to help influence and acquire interest that would lead to investment.   That was Climb2Glory's role."   Mangin further explained that initially Climb2Glory represented the Endurance for "contract dollars," but later took a stake in Lordstown: "[w]e did get a significant amount of shares in the deal so what we do now is we still leverage our network."   *See* ¶ 102, above (regarding Climb2Glory's registration for resale of $1.4 million in Lordstown shares).

124.    The Hindenburg Report detailed numerous additional purported "pre-orders" that "appear similarly meaningless," including purported deals with FirstEnergy, Momentum Groups, Summit Petroleum Inc., Mike Albert Fleet Solutions, Grid-X, and the City of Ravenna.  *See* ¶¶ 84, 92, above (touting various pre-order customers including FirstEnergy, Grid-X, and Summit Petroleum Inc.).

125.    The Hindenburg Report further detailed what happened with the first road test for the Endurance: it burst into flames.  The Hindenburg Report included a portion of the police report which it received through a FOIA request:

39

| Narrative: |
| --- |
| CR No: 210001110-001    Written By: FHBRAGOLEJ (00472)    Date: 01/13/2021 01:54 AM |

I was dispatched to the area of 12 Mile Rd. and Copper Creek Lane to assist the fire department for a vehicle fire.

Upon arrival, I observed the truck fully engulfed in the eastbound 12 Mile Rd. lanes just east of Copper Creek Lane.

FHFD and Ofc. Washington arrived on scene.

I spoke with the driver of the vehicle, Pirakalathan Pathmanathan, who advised me that he was the director of power train for Lordstown Motors. Pathmanathan explained that the vehicle was a 2021 Lordstown Endurance that had cleared testing inside of the facility. Pathmanathan stated that this was the first road test for the Endurance and added that it is a fully electric truck. Pathmanathan said that he took two of his co-workers, Simone Palombi and Akshay Sharma, for the road test with him and wthey ere driving it for about ten minutes before it caught on fire.

I asked Pathmanathan what happened and he stated they were driving the vehicle and noticed the truck was driving weird. Pathmanathan stated he pulled over and the Endurance started on fire from underneath the truck.

126.    According to the Hindenburg Report, just two weeks after this disastrous initial road test, Lordstown announced that it would begin building beta trucks in a month.  Lordstown did not acknowledge until a month later that "it did have 'an event', stating that 'we do not generally comment on individual testing conditions.'"

127.    In the Hindenburg Report, Hindenburg Research described its conversation with a former Lordstown employee "who was intimately familiar with the path toward production.  They explained that Lordstown has built fewer than 10 prototypes so far, and that the [C]ompany is still making extensive modifications."  This former employee also detailed that in mid-January 2021, Lordstown "totally switched from a plastic exterior to aluminum" to reduce weight.  The former employee called this change "drastic" and suggested that this would "essentially restart any testing and validation process."

128.    This same former employee also explained that Lordstown had not completed any of its required testing and validation, including: "[c]old weather testing, which typically takes about 3 months and had not begun"; "[a] 'million mile' test or similar durability test done by major

automakers," which typically "requires 6 months of 24/7 testing"; or "[m]ajor testing required for the [FMVSS] by the [National Highway Traffic Safety Administration]."

129.     The Hindenburg Report also quoted a union leader, who worked for decades at the Lordstown plant for GM, who stated:

> I know they're way behind. If nothing else went wrong then Covid threw them way behind. They can't fire up the old machines. Some of them they can. But everything else has to be reprogrammed and some of it has to be rebuilt. . . . It's not ready. It is not ready. They showed some stuff on TV in the body shop with the robots that do the welding. But if you never worked in a body shop you didn't realize they weren't working. They were moving but not welding. There were no sparks.

130.     In response to the Hindenburg Report, the price of Lordstown common stock plummeted more than 16% in one day, down from its March 11, 2021 closing price of $17.71 per share to a March 12, 2021 close of just $14.78 per share, thereby erasing $517 million in stockholder value.

131.     On March 17, 2021, Lordstown held an earnings call on which Defendant Burns first disclosed that Lordstown had received an inquiry from the SEC.

132.     When interviewed by *CNBC* on the morning of March 18, 2021 before the opening of trading, Defendant Burns now claimed that the Company had "never said we had orders," and admitted that the Company "[didn't] have a product yet," adding that "[b]y definition we can't have orders."  He further stated that the previously much hyped "preorders did exactly what they were supposed to do.  Gauge interest.  Nobody knew if fleets would buy an electric pickup truck. It was completely unknown science, no data around it."  He concluded, stating: "I don't think anybody thought we had actual orders.  That's just not the nature of this business."

133.     On this news, the stock dropped another 13% to $13.01 per share, thereby erasing an additional $367 million in market capitalization.

134.     Beginning on March 18, 2021, Lordstown investors filed a series of class actions in the United States District Court for the Northern District of Ohio (as previously defined, the "Securities Class Action").  The Securities Class Action seeks to recover millions of dollars in investor losses from the Company and its senior officers caused by the false and misleading statements concerning the Company's business, operations, and prospects.

135.     On March 24, 2021, Hindenburg Research posted pictures of the Endurance prototype breaking down during a commercial shoot about three months prior to the Merger (around July 2020), at which time the Company had claimed it would begin delivering its pickup trucks in early 2021:





136.    On this disclosure, the market price of Lordstown common stock declined another $1.21 per share, closing down at $11.38 per share on March 24, 2021 and erasing another $213 million in market capitalization.

137.    On March 25, 2021, Youngstown Ohio NBC Station, WFMJ-TV, posted an article on its website entitled, "Lordstown Motors knew of SEC investigation month before public announcement."  The article reported Lordstown's failure to timely disclose the SEC investigation and described the pending Securities Class Action, stating in part:

> The company that plans to manufacture all-electric pickup trucks at the former GM Lordstown Assembly plant has formally acknowledged that it is being investigated by the [SEC] and that began in mid-February.
>
> An annual report filed with the SEC by [Lordstown] states that on February 17, 2021, [Lordstown] received a request from the SEC for the voluntary production of documents and information, including relating to the merger between DiamondPeak and Legacy Lordstown and pre-orders of vehicles.
>
> [Lordstown] CEO [Burns] did not reveal the SEC request to members of the news media until one month later during a March 17 conference call with members of the press and investors.
>
> There was also no mention of the SEC probe in [Lordstown's] fourth quarter and year-end financial report that was filed last week.

That omission was mentioned in one of two lawsuits filed by investors alleging securities violations by [Lordstown].

As late as January 11, one month before the SEC request, [Lordstown] issued a press release announcing that it had surpassed 100,000 pre-orders for the Lordstown Endurance.

The company says it expects those lawsuits, which seek to become class actions, will be consolidated in U.S. District Court.

"..we intend to vigorously defend against the claims, but there can be no assurances as to the outcome," [Lordstown] says in its latest SEC filing.

[Lordstown] says in the Annual Report that it is responding to the SEC's requests and intend to cooperate with the inquiry.

138.    On June 14, 2021, defendants caused the Company to issue a press release via Form 8-K filed with the SEC announcing that, "pursuant to mutual agreements with the Company, [Burns] resigned as the [CEO] of the Company and from the Company's [Board]."  In addition, the release explained that "[Rodriguez] resigned as [CFO] of the Company."  Pursuant to a Separation and Release Agreement, Burns will receive "continued base salary payments for a period of 18 months in the aggregate amount of $750,000" and Rodriguez will receive "continued base salary payments for a period of six months in the aggregate amount of $200,000 and continued vesting of certain outstanding stock options with an exercise price per share equal to $1.79 that are scheduled to vest in November 2021."

139.    Also on June 14, 2021, Lordstown issued a press release admitting that certain prior statements regarding pre-orders were inaccurate.  That day, Lordstown announced the results of an investigation conducted by a Special Committee of the Board of purportedly independent directors (Defendants Hamamoto, Reiss, and Spencer) into the allegations of the Hindenburg Report published on March 12, 2021.  Among other things, the press release stated:

**4. Pre-Orders**

The Hindenburg Report raised various questions regarding the Company's practices and disclosures regarding "pre-orders." Among other things, the Hindenburg Report stated that [Lordstown's] pre-orders (i) are non-binding letters of intent, (ii) require no reservation payment and in some instances were procured through the payment of sales commissions, (iii) are from customers that generally do not operate fleets, and (iv) include pre-orders from customers that do not have the means to make the purchases indicated.

[Lordstown] has repeatedly disclosed that its pre-orders are non-binding, and it has highlighted the risk that pre-orders may not be converted to actual orders.

In most instances, [Lordstown's] pre-orders did not require a reservation or similar payment, though pre-orders submitted through a website portal required a refundable $100 payment. [Lordstown] entered into an arrangement to pay one entity commissions for procuring pre-orders. That entity procured approximately 1,000 pre-orders and also assisted [Lordstown] into entering into an important commercial relationship with a leading fleet management company.

[Lordstown] has obtained tens of thousands of pre-orders from fleets, fleet management companies, or other end users. If converted to orders, this demand will comprise substantially all of the Company's expected production volume through 2022.

***[Lordstown] made periodic disclosures regarding pre-orders which were, in certain respects, inaccurate.***

- [Lordstown] has stated on several occasions that its pre-orders were from, or "primarily" from commercial fleets. In fact, many pre-orders were obtained from (i) fleet management companies or other end users that indicated interest in purchasing Endurance trucks, similar to commercial fleets, and (ii) so-called "influencers" or other potential strategic partners that committed to attempt to secure pre-orders from other entities, but did not intend to purchase Endurance trucks directly.

- One entity that provided a large number of pre-orders does not appear to have the resources to complete large purchases of trucks. Other entities provided commitments that appear too vague or infirm to be appropriately included in the total number of pre-orders disclosed.

140.     On June 15, 2021, one day after terminating the former CEO and CFO, Angela Strand, interim CEO, and Schmidt, President of the Company, attended an Automotive Press Association online media event.  During the event, Strand stated that it is a "new day" for the

automaker.  Schmidt stated that the Company has enough orders for limited production of the Endurance for 2021 and 2022, calling those orders "firm" and "binding."

141.    Then, on June 17, 2021, defendants caused the Company to issue another press release via Form 8-K filed with the SEC announcing that Company executives had made false and misleading statements at the June 15, 2021 Automotive Press Association online media event regarding so-called vehicle purchase agreements.  Specifically, the Company admitted it has "no binding purchase orders or commitments from customers":

> To clarify recent remarks by company executives at the Automotive Press Association online media event on June 15, although these vehicle purchase agreements provide us with a significant indicator of demand for the Endurance, these agreements do not represent binding purchase orders or other firm purchase commitments.  As previously disclosed in our Form 10-K/A for the year ended December 31, 2020, filed with the [SEC] on June 8, 2021, to date, we have engaged in limited marketing activities and we have no binding purchase orders or commitments from customers.

### E.    Defendants Rodriguez, Fabian, and Hamamoto Sold Nearly $23 Million in Lordstown Stock While in Possession of Material Non-Public Information

142.    Defendant Rodriguez was the Company's CFO and has a highly sophisticated understanding of the Company's results and their import.

143.    As set forth herein, Defendant Rodriguez possessed material negative information about the Company which he knew was being concealed from investors.  Defendant Rodriguez consciously acted to exploit his knowledge by selling 9,300 shares of Lordstown stock on February 4, 2021 for proceeds of $251,100.

144.    Defendant Schmidt is the Company's President and possesses a highly sophisticated understanding of the Company's results and their import.

145.    As set forth herein, Defendant Schmidt possessed material negative information about the Company which he knew was being concealed from investors.  Defendant Schmidt

consciously acted to exploit his knowledge by selling 263,412 shares of Lordstown stock on December 11, 2020 and February 2-3, 2021 for proceeds of $6,383,710.

146.    Defendant Hamamoto is a director of the Company and served as DiamondPeak's Chairman and CEO until the Merger.  Defendant Hamamoto possesses a highly sophisticated understanding of the Company's results and their import.

147.    As set forth herein, Defendant Hamamoto possessed material negative information about the Company which he knew was being concealed from investors.  Defendant Hamamoto consciously acted to exploit his knowledge by selling one million shares of Lordstown stock on October 22, 2020 for proceeds of $16.38 million.

148.    Defendants Rodriguez, Schmidt, and Hamamoto used their fiduciary positions to enrich themselves and failed to discharge their duties by causing the Company to candidly reveal the truth of its business condition.

## V.    DAMAGES TO LORDSTOWN

149.    As a result of the Individual Defendants' faithless misconduct, Lordstown disseminated improper public statements concerning its business, operations, and prospects.  These improper statements have devastated Lordstown's credibility, caused the Company to lose more than $1 billion in market capitalization, and exposed the Company to significant investigatory costs and risk of loss associated with the SEC and DOJ investigations and Securities Class Action.

150.    Defendants' wrongdoing has also irreparably damaged Lordstown's corporate image and goodwill.  For at least the foreseeable future, Lordstown will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that Lordstown's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired.  The Company stands to incur higher marginal costs of capital and debt because of the misconduct.

151.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has needlessly expended, and will continue to expend, significant sums of money.  These expenditures include, without limitation: (i) costs and damages associated with the overpayment for the acquisition of Lordstown in the Merger; (ii) costs incurred in connection with issuing false and misleading proxy solicitations seeking approval of the Merger; (iii) costs incurred to compensate "consultants" for generating fictious and significantly inflated pre-orders; (vi) costs incurred responding to the Hindenburg Report and related analyst, investor, customer, media, and/or similar inquiries; (v) costs incurred in investigating and defending Lordstown and the Securities Class Action Defendants in the Securities Class Action; (vi) costs incurred responding to the SEC and DOJ inquiries and any future regulatory investigations and actions; (vii) lost sales and orders resulting from exposure of Lordstown's misleading disclosures regarding its business, operations, and prospects; and (viii) costs incurred from compensation and benefits paid to the Individual Defendants, who have breached their fiduciary duties to Lordstown.

## VI.     DEFENDANTS' DUTIES

### A.     The Individual Defendants' Fiduciary Duties

152.     By reason of their positions as officers and/or directors of Lordstown and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.  Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

48

153.    Because of their positions of control and authority as officers and/or directors of Lordstown, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Lordstown, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

154.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lordstown and was at all times acting within the course and scope of such agency.

155.    To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Lordstown.  By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

a.    exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);

b.    neither violate nor knowingly permit any officer, director, or employee of Lordstown to violate any applicable laws, rules, or regulations;

c.    remain informed as to the status of Lordstown's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

d.    establish and maintain systematic and accurate records and reports of the business and affairs of Lordstown and procedures for the reporting of the

Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.    maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Lordstown are conducted in accordance with all applicable laws, rules, and regulations;

f.    truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

g.    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

h.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.    Duties Pursuant to the Company's Corporate Governance Guidelines**

156.    The Company's Corporate Governance Guidelines ("Governance Guidelines") were adopted by the Board to, along with the certificate of incorporation, bylaws, and Board committee charters, form the framework for governance of the Company. These guidelines apply to the Director Defendants in connection with their membership on Lordstown's Board.

157.    According to the Governance Guidelines, the Board's responsibilities include the following:

*Risk Assessment* — The Board shall maintain oversight of the Company's risk management processes. The Compensation Committee shall periodically evaluate whether there are any risks arising from the Company's compensation policies for all employees and overall actual compensation practices which are reasonably likely to have a material adverse effect on the Company, and recommend to the Board any changes deemed appropriate by such committee. The Audit Committee shall review and discuss with management and the independent auditor the Company's major enterprise risk exposures and the steps management has taken to monitor and control those exposures, including the Company's policies with respect to risk assessment and risk management with respect to operational, financial, accounting and tax matters of the Company, including data privacy and security. To the extent risk oversight is a focus of one or more committees of the Board, those committees shall report key findings periodically to the full Board.

158.    According to the Governance Guidelines, "Board Operations" include the following:

D)    *Director Responsibilities* — Directors must exercise their business judgment to act in the best interests of the stockholders and the Company. Directors are expected to attend and participate in all meetings of the Board and of committees on which they serve and to spend the time needed and prepare for and meet as frequently as necessary to discharge their responsibilities. The Board shall make the determination that at least one of the members of the Audit Committee meets the Audit Committee financial expert requirements. Each director should be sufficiently familiar with the business of the Company, including its financial statements and capital structure, and the risks and competition it faces, to facilitate active and effective participation in the deliberations of the Board and of each committee on which he or she serves. Upon request, management will make appropriate personnel available to answer any questions a director may have about any aspect of the Company's business. Directors should also review the materials provided by management and advisors in advance of the meetings of the Board and its committees and should arrive prepared to discuss the issues presented.

E)    *Director Loyalty and Ethics* — In their roles as directors, all directors owe a duty of loyalty to the Company. This duty of loyalty mandates that the best interests of the Company take precedence over any interests possessed by a director. The Company has adopted a Code of Business Conduct and Ethics. Certain portions of the Code deal with activities of directors, particularly with respect to transactions in the securities of the Company, potential conflicts of interest, the taking of corporate opportunities for personal use, and competing with the Company. Directors should be familiar with the Code's provisions in these areas and should consult with the Company's counsel in the event of any issues.

## C.    Duties Pursuant to the Company's Code of Business Conduct and Ethics

159.    The Individual Defendants were also bound by the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all Lordstown directors, officers, and employees.  Among other things, the Code of Conduct states that: "It is the general policy of [Lordstown] to conduct its business activities and transactions with the highest level of integrity and ethical standards and in accordance with all applicable laws."

160.    With respect to the Company's "Basic Principles and Practices," the Code of Conduct includes the following:

**1.      Compliance with Laws, Rules and Regulations**

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee, officer and director to adhere to the both the spirit and the form of the standards and restrictions imposed by those laws, rules and regulations in the performance of their duties for the Company, including those relating to accounting and auditing matters and insider trading.

*      *      *

**5.      Fair Dealing**

We believe in succeeding through honest business competition. We do not seek competitive advantages through illegal or unethical business practices. Each director, officer and employee should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair business practice.

*      *      *

**8.      Insider Trading**

You are not permitted to use, share or disseminate confidential information to, or enable others to, purchase or sell securities in violation of the federal securities laws or for any other purpose except the conduct of our business. To use confidential information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but is also illegal.  You are expected to comply with the Company's Insider Trading Policy.

*      *      *

**10.      Disclosure**

The Company's periodic reports and other documents filed with the [SEC], including financial statements and other financial information, must comply with applicable federal securities laws and SEC rules. Each director, officer and employee, to the extent involved in the Company's disclosure process, must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting, to the extent relevant to his or her area of responsibility, so that the Company's public reports and documents filed with the SEC comply in all material respects with the applicable federal securities laws and SEC rules; and (b) to the extent appropriate within his or her are responsibility, take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

Each director, officer or employee, to the extent involved in the Company's disclosure process, must:

• familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company; and

• not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations

### D.   Additional Duties of the Audit Committee Defendants

161.   In addition to the fiduciary duties discussed above, the Audit Committee Defendants owed specific duties to Lordstown under the Audit Committee Charter (the "Audit Charter"). According to the Audit Charter "[t]he function of the Audit Committee is primarily one of oversight."

162.   According to the Audit Charter, the Audit Committee was responsible for assisting the Board in oversight of:

- the integrity of the Company's financial statements,
- the Company's compliance with legal and regulatory requirements,
- the independent auditor's qualifications, independence and performance,
- the organization and performance of the Company's internal audit function,
- the Company's internal accounting and financial controls,
- the Company's treasury and finance matters, and
- the Company's risk management and assessment pertaining to, amongst other matters, the financial, operational, accounting and tax matters of the Company, including data privacy and security.

163.   According to the Audit Charter, the Audit Committee was also responsible for providing to the Board "such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board."

164.   The Audit Charter charges the Audit Committee Defendants with the following additional duties and responsibilities, among others:

5.    <u>Review Financial Statements</u>. The Audit Committee shall review and discuss the following with management, the independent auditor and, if appropriate, the director of the internal auditing department:

•      The scope and timing of the annual audit of the Company's financial statements;

•      The Company's annual audited and quarterly financial statements and annual and quarterly reports on Forms 10-K and 10-Q (when the Company is required to comply with such reporting obligations), including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board, if deemed appropriate, whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K, in accordance with the rules and regulations of the SEC;

•      The results of the independent audit and the quarterly reviews, any significant matters arising from any audit, including any audit problems or difficulties (including any critical audit matter ("CAM") addressed in the audit and the relevant financial statement accounts or disclosures that relate to each CAM, whether raised by management, the internal auditing department or the independent auditor, relating to the Company's financial statements;

•      The form of opinion the independent auditor propose to render to the Board of Directors and shareholders;

•      The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures and any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor to the Company;

•      Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

•      Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; on the financial statements;

•      The effect of regulatory and accounting initiatives, as well as off-balance-sheet structures, on the Company's financial statements;

•      Any significant changes required or taken in the audit plan as a result of any significant control deficiency or material weakness;

•      Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response; and

•      Any significant disagreements between management and the independent auditor and management's response.

*      *      *

8.      <u>Earnings Press Releases and Earnings Guidance</u>. The Audit Committee shall review and discuss with management the type and presentation of information to be included in earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information) and financial information and earnings guidance provided to analysts and rating agencies.

9.      <u>Internal Controls</u>. The Audit Committee shall:

•      Advise management, the internal auditing department and the independent auditor that they are expected to provide to the Audit Committee a timely analysis of significant issues and practices relating to accounting principles and policies, financial reporting and internal control over financial reporting;

•      Consider any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Audit Committee by the independent auditor required by or referred to in SAS 61 (as codified by AU Section 380), as it may be modified or supplemented or other professional standards;

•      Review and discuss with management, the internal auditor (or other personnel or service providers responsible for the internal audit function), and the independent auditor the adequacy and effectiveness of the Company's internal controls over financial reporting, including any significant changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditor (or other personnel or service providers responsible for the internal audit function) or management and any special audit steps adopted in light of any such significant control deficiencies or material weaknesses and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls; and

•      Inquire of the [CEO] and [CFO] as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

10.    <u>Disclosure Controls and Procedures</u>. The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

\*        \*        \*

12.    <u>Legal and Regulatory Compliance</u>.  The Audit Committee shall review and discuss with [Lordstown's] General Counsel (the "General Counsel") and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, and make a recommendation to the [Board] with respect to the disposition of any proposed waiver and review any potential ethics violations brought to the attention of the Audit Committee and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters. The Audit Committee shall discuss with the General Counsel and the independent auditor any significant legal, compliance or regulatory matters (including any correspondence, notices or inquiries with or from regulators or governmental agencies and any published reports) that may have a material effect on the Company's financial statements or accounting policies. The Audit Committee shall periodically discuss with the Company's Legal Department, or outside legal counsel, as applicable, legal, compliance or regulatory matters that may have a material impact on the financial statements or the Company's business, financial statements or compliance procedures that pertain to financial, accounting or tax matters of the Company. The Audit Committee shall have direct communication with the Company's Legal Department, or outside legal counsel, as applicable, as needed.

\*        \*        \*

14.    <u>Risks</u>. The Audit Committee shall review and discuss with management and the independent auditor the Company's major enterprise risk exposures and the steps management has taken to monitor and control those exposures, including:

• the Company's guidelines and policies with respect to financial risk assessment and financial risk management pertaining to financial, accounting and tax matters;

• the Company's information technology risk management guidelines and policies, including with respect to data security and privacy; and

• the Company's other major risk exposures, including with respect to operational matters, and the steps management has taken to monitor and control such exposures.

15.    <u>Related Party Transactions</u>. The Audit Committee shall review the Company's policies and procedures with respect to related party transactions and review and approve all related party transactions of the Company in accordance with the policies and procedures of the Company in effect from time to time.

16.   Conflicts of Interest. The Audit Committee shall:

• Review and monitor compliance with the Company's Code of Business Conduct and Ethics, and from time to time or as necessary recommend to the Board any revisions to the Board that the Audit Committee deems appropriate or to ensure compliance with such laws, regulations and rules;

• Consider questions of possible conflicts of interest of Board members and of corporate officers; and

• Review actual and potential conflicts of interest of Board members and corporate officers and approve or prohibit any involvement of such persons in matters that may involve a conflict of interest or the taking of a corporate opportunity.

## VII.   DERIVATIVE ALLEGATIONS

165.   Plaintiffs bring this action derivatively in their own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Lordstown as a direct result of the Individual Defendants' violations of the federal securities laws, breaches of fiduciary duty, and unjust enrichment.

166.   Lordstown is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

167.   Plaintiffs are current stockholders of Lordstown (and its predecessor company, DiamondPeak) and have continuously owned such shares since at least at least August through November 2020.  Plaintiffs plan to hold Lordstown shares continuously throughout the pendency of this action.  Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

168.   Because current members of the Lordstown Board lack independence and/or face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its stockholders.

169.    The wrongful acts complained of herein subjected, and continue to subject, Lordstown to harm.

## VIII.    FUTILITY ALLEGATIONS

170.    Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

171.    When this action was filed,[4] Lordstown's Board consisted of Defendants Burns, Hamamoto, Feldman, Reiss, Spencer, Gates, Kowitz, Strand Boydston, and Rucidlo (the "Demand Board").  Plaintiffs have not made any demand on the Demand Board to institute this action because such a demand would be a futile and useless act.

### A.    Demand Is Excused as to Burns and Hamamoto Because They Lack Independence

172.    Lordstown has conceded in its SEC filings that Burns is not an independent director.  Specifically, in the Company's December 4, 2020 Prospectus on SEC Form 424B3, Lordstown concedes that the Board did not find Burns to be independent under the NASDAQ's listing rules.  Burns is not an independent director because his principal professional occupation is his employment with Lordstown.  Burns is the Company's founder and its former CEO and Chairman, and has received and continues to receive substantial monetary compensation and other benefits.  Moreover, Burns holds a significant percentage of Lordstown's outstanding common stock which was worth $479 million as of July 1, 2021.  Burns was also the primary negotiator on behalf of Lordstown in connection with the Merger and was the individual who stood to gain the most by its consummation and the continued misrepresentation of Lordstown's business.  This lack of independence renders Burns incapable of impartially considering a demand to commence and vigorously prosecute this action.

---

[4] The lead case in this consolidated action was filed on April 28, 2021.

173.     Hamamoto lacks independence due to having recently served as CEO and Chairman of Lordstown's predecessor, DiamondPeak, and having been the primary negotiator on behalf of DiamondPeak in connection with the Merger.  Hamamoto beneficially owns a significant amount of Lordstown common stock which was worth $43.8 million as of July 1, 2021, and which he received as a result of the consummation of the Merger through materially false and misleading proxy solicitations.  Like Burns, Hamamoto was interested in the Merger transaction given his significant financial interest in its consummation and the continued misrepresentation of Lordstown's business.  This lack of independence renders Hamamoto incapable of impartially considering a demand to commence and vigorously prosecute this action.

**B.      Demand Is Excused Because All Demand Board Members Face a Substantial Likelihood of Liability for Their Misconduct**

174.     As set forth herein, the Demand Board breached their fiduciary duties of loyalty and good faith by making or allowing to be made improper statements in Lordstown's (and DiamondPeak's) press releases, public filings, and other public statements.  Notably, these defendants signed the Company's false and misleading Registration Statement which registered for sale their personally held Lordstown shares[5] and which misrepresented Lordstown's Endurance prototype, its limited marketing activities, its commercial production timeline and sales targets, its pre-orders, and the demand for its Endurance pickup truck.

175.     Demand Board members Feldman, Reiss, and Rucidlo, as members of the Audit Committee, had a duty to adequately oversee Lordstown's compliance with legal and regulatory requirements, including public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions.  Thus, the Audit Committee

---

[5] Although Reiss, Spencer, and Strand Boydston signed the Registration Statement, it appears they did not register any of their personally-held Company shares for resale.

Defendants were responsible for knowingly or recklessly allowing the improper statements detailed herein. The Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving or otherwise allowing the improper statements, and therefore failing to properly oversee Lordstown's compliance with legal and regulatory requirements, risk assessment, and the Company's internal controls.

176.   Demand Board member Hamamoto violated his fiduciary duties by trading on inside information. On October 22, 2020, while the price of Lordstown's common stock was artificially inflated by the Individual Defendants' false and misleading public statements and omissions, and while Hamamoto was in possession of material, adverse nonpublic information, he sold one million shares of personally held [Lordstown] stock at artificially inflated prices for proceeds of $16.38 million.

177.   Demand Board members Burns, Hamamoto, Reiss, and Spencer further violated Sections 14(a) and 20(a) of the Exchange Act by negligently making material misstatements and omitting material facts in connection with their proxy solicitations, as described herein.

178.   Burns is also named as a defendant in the pending Securities Class Action which allege that he violated Sections 10(b) and 20(a) of the Exchange Act by affirmatively making false and misleading statements and/or controlling Lordstown and its Section 10(b) violations.

179.   Accordingly, all the members of the Demand Board face a substantial likelihood of liability for their breaches of fiduciary duty and violations of state and federal law, making any demand upon them futile.

**C.    Demand Is Excused Due to Burns' Control Over the Demand Board**

180.   Defendants Hamamoto, Feldman, Reiss, Spencer, Gates, Kowitz, Strand Boydston, and Rucidlo also lack independence from Defendant Burns, an interested director, due to Defendant Burns' domination and control over the Demand Board. Burns is the founder of

Lordstown and, at the time this action was initiated, its CEO and Chairman, and by all accounts was the driving force behind the Company.  As of July 1, 2021, he owned 26.25% of the Company's outstanding Class A common stock.  Given this level of control, Burns handpicked the majority of Lordstown's officers and directors.  Indeed, while at Workhorse Group, Burns developed a reputation for hiring friends and relatives as top executives.

181.   Demand Board members Reiss and Spencer were chosen by Burns and first appointed to Lordstown's Board prior to the Merger, in February 2020.  As result, they each received 83,822 shares of Lordstown Class A common stock which was worth more than $1.68 million post-Merger.  Each of these directors owe their position on the Lordstown Board and their substantial stock remuneration to Defendant Burns.  Both Reiss and Spencer are therefore beholden to Burns.

182.   In connection with the closing of the Merger, Burns was given the power to unilaterally nominate six of the nine members of the post-Merger (Demand) Board and also empowered to nominate a seventh director, in consultation with DiamondPeak.  As described in the Company's October 8, 2020 proxy statement:

> **[Burns] will have significant influence over us after the closing.**
>
> Upon closing, [Burns] will beneficially own our Class A common stock representing approximately 27.7% of our outstanding voting power (or 35.5% assuming a maximum redemption by our public stockholders of 27,000,000 public shares). As long as [Burns] own or control a significant percentage of our outstanding voting power, he will have the ability to influence certain corporate actions requiring stockholder approval.
>
> In addition, assuming the [d]irector [e]lection [p]roposal is approved, our [Board] following the closing will include, in addition to one director designated by DiamondPeak, one director designated by DiamondPeak in consultation with [Burns] and one director designated by [Burns] in consultation with DiamondPeak, six directors designated by [Burns]. See section entitled "Proposal Number 4 — The Director Election Proposal" for more information with respect to the nomination of individuals to our board of directors following the closing.

183.    Moreover, each of the directors on the Demand Board (with the exception of Burns) has received and will continue to receive substantial cash and equity compensation for their service on the Board and its committees.  On February 5, 2021, each director also received an annual grant of $165,000 in restricted stock units for "their earlier service on the Board."

184.    Accordingly, at least six of the nine directors were unilaterally chosen by Burns, are beholden to him, and would not be able to objectively determine whether to prosecute Burns (and others) for their breaches of fiduciary duty and other violations of law.

185.    There is reasonable doubt that a majority of Demand Board members are capable of independently considering a demand to commence and vigorously prosecute an action against Burns (and others, including themselves) due to Burns' domination and control of the Board at the time this action was initiated.

### D.    Demand Is Excused For Additional Reasons

186.    Any suit by the Demand Board to remedy these wrongs would significantly increase the exposure of Nominal Defendant Lordstown to liability for violations of the federal securities laws in the pending Securities Class Action and would potentially result in civil actions being filed against one or more additional Director Defendants.  If the Board elects for the Company to press forward with its rights of action in this case, then Lordstown's efforts would compromise its own defense of the Securities Class Action.

187.    Hamamoto, Feldman, Reiss, Spencer, Gates, Kowitz, Strand Boydston, and Rucidlo are likewise conflicted and unable to pursue the Company's claims against the Officer Defendants.  Any effort to prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Lordstown's name would necessarily expose the Board's own culpability for the very same conduct.  In other words, given that the Board was required to be regularly informed concerning the Company's operations, business,

62

prospects, and public reporting, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Demand Board.  This is particularly true with respect to Hamamoto, who oversaw DiamondPeak's due diligence on and negotiations with (legacy) Lordstown and who led DiamondPeak's efforts to solicit stockholder votes in support of the Merger.

188.    The acts complained of constitute violations of the fiduciary duties owed by Lordstown's officers and directors, and these acts are incapable of ratification.  Despite having knowledge of the claims and causes of action raised by Plaintiffs, the Board has failed to take any action against those responsible, much less seek to recover on behalf of the Company for any of the wrongdoing by the Individual Defendants.

189.    Demand Board members Spencer and Strand Boydston serve together on the Compensation Committee.  These individuals set their own compensation, as well as the compensation of their colleagues on the Demand Board.  Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a stockholder demand to investigate or prosecute an action pertaining to the Individual Defendants' improper conduct.

## IX.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

190.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

191.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Lordstown (and its predecessor), regarding the Company's business, operations, and prospects; and (ii) enhance the Individual Defendants' executive and directorial positions at Lordstown and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

192.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused and/or allowed the Company to issue improper public statements.

193.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and prospects.

194.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

195.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## X.     CLAIMS FOR RELIEF

### COUNT I

#### Violations of Section 14(a) and 20(a) of the Exchange Act
#### (Against the Proxy Defendants)

196.    Plaintiffs incorporate by reference and realleges each and every allegation contained above (except as set forth in the following ¶ 197), as though fully set forth herein.

197.    The Section 14(a) and 20(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) and 20(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims

198.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his [or her] name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

199.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy solicitation shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

200.    Between August 3, 2020 and October 22, 2020, the Proxy Defendants solicited stockholder votes in favor of the Merger through use of materially false and misleading statements and failures to disclose in their proxy solicitations as set forth at ¶¶ 77-97, above.  In soliciting stockholder votes, the Proxy Defendants misrepresented and failed to disclose the following true facts about the Company's business, operations, and prospects (as described in greater detail at ¶¶ 118-129, 137):

    (a)    Lordstown greatly overstated potential demand for the Endurance pickup truck because, among other things, the number of Endurance pre-orders was largely fictitious, significantly inflated, and reflected "pre-orders" by customers lacking the intent and/or means to purchase its trucks;

    (b)    Lordstown overstated and misrepresented its pre-orders in order to raise capital, confer legitimacy, and provide investors with an overstated and false sense of confidence in the Company's prospects;

    (c)    Lordstown faced considerable undisclosed design, performance, reliability, and production obstacles that would continue to delay production and delivery of the Endurance for potentially years beyond the third quarter of 2021; and

    (d)    as a result of the foregoing, statements by and on behalf of Lordstown concerning its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis when made.

201.    The Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially false and misleading statements to stockholders, which were made for the purpose of soliciting stockholder votes to approve DiamondPeak's acquisition of Lordstown in the Merger.  In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements made would be rendered materially false and misleading.

202.    The proxy solicitation process was an essential link in the approval of the Merger. The misrepresentations and omissions were material to DiamondPeak stockholders in voting on the matters set forth for stockholder determination, including the approval of the Merger.

203.    As a direct and proximate result of these defendants' wrongful conduct, DiamondPeak, Lordstown, and the Proxy Defendants misled and/or deceived DiamondPeak's stockholders by making materially false and misleading statements that were an essential link in stockholders heeding the DiamondPeak board of directors' recommendation to approve the acquisition of Lordstown.

204.    The Company was damaged as a result of the Individual Defendants' materially false and misleading statements in their proxy solicitations.  Plaintiffs, on behalf of Lordstown, hereby seek relief for damages inflicted upon the Company based upon the misleading proxy solicitations in connection with the Merger approval of the acquisition of Lordstown by DiamondPeak.

205.    Because of their positions of control and their authority over DiamondPeak and Lordstown, the Proxy Defendants were able to and did control the actions of the companies, their employees, and the contents of the proxy solicitations, as set forth herein.  The Proxy Defendants therefore qualify as "controlling persons" within the meaning of Section 20(a) of the Exchange Act.  By reason of the above conduct, the Proxy Defendants are also, or alternatively, liable as control persons of Lordstown (or its predecessor) pursuant to Section 20(a) of the Exchange Act.

## COUNT II

**For Contribution for Violations of Section 10(b) and 21D of the Exchange Act**
**(Against the Securities Class Action Defendants)**

206.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

67

207.    Defendants Burns, Schmidt, Rodriguez, and Fabian are named defendants in the Securities Class Action.

208.    Lordstown is named as a defendant in the Securities Class Action, which assert claims under the federal securities laws for, *inter alia*, violations of Section 10(b) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of these defendants as alleged herein.  The Company is entitled to receive contribution from the Securities Class Action Defendants in connection with the Securities Class Action against the Company.

209.    Defendants Burns, Schmidt, Rodriguez, and Fabian as directors and officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Lordstown, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and Rule 10b-5.

210.    Defendants Burns, Schmidt, Rodriguez, and Fabian are liable under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

211.    As a result, Defendants Burns, Schmidt, Rodriguez, and Fabian damaged Lordstown and are liable to the Company for contribution.

212.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## COUNT III

### Breach of Fiduciary Duties of Care and Loyalty
### (Against the Officer Defendants)

213.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

214.     The conduct of the Officer Defendants complained of herein involves a knowing and culpable violation of their obligations as officers of Lordstown, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Officer Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

215.     The Officer Defendants owed fiduciary duties to Lordstown and its stockholders. By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of care, good faith, loyalty, candor, and truthful disclosure.  In addition, the Officer Defendants had specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

216.     The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)     Affirmatively making, allowing, controlling, and/or failing to correct improper and misleading statements in Lordstown's press releases, SEC filings, conference calls, and other public statements, relating to, among other things, Lordstown's business, operations, and prospects;

(b)     Failing to ensure the Company's compliance with relevant legal and regulatory requirements, as well as its own internal policies and procedures, including but not limited to requirements imposed under federal and state securities laws and the Company's Code of Conduct;

(c)     Failing to implement, maintain, and monitor adequate internal controls; and

(d)     Paying or causing the Company to pay themselves compensation while in breach of their fiduciary duties, which also included share-based compensation awarded at share prices that were artificially inflated by their misconduct.

217.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Lordstown has sustained significant damages.  Accordingly, the Officer Defendants are liable to the Company.

218.    In addition, each of the Officer Defendants had actual knowledge of the Individual Defendants' breaches of fiduciary duties, knowingly participated in the breaches, and Lordstown has sustained significant damage as a result.  Accordingly, the Officer Defendants are further liable to the Company for aiding and abetting their fellow defendants' breaches.

219.    Plaintiffs, on behalf of Lordstown, have no adequate remedy at law.

## COUNT IV

### Breach of Fiduciary Duties of Loyalty
### (Against the Director Defendants)

220.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

221.    The Director Defendants owed fiduciary duties to Lordstown and/or its predecessor and their stockholders.  By reason of their positions as fiduciaries, the Director Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  In addition, the Director Defendants have and had specific fiduciary duties as defined by relevant corporate governance documents, including the Governance Guidelines, the Code of Conduct, the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

222.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)    Affirmatively making, allowing, controlling, and/or failing to correct improper and misleading statements in Lordstown's press releases, SEC filings, conference calls, and other public statements, relating to, among other things, Lordstown's business, operations, and prospects;

(b)    Failing to ensure the Company's compliance with relevant legal and regulatory requirements, as well as its own internal policies and procedures, including but not limited to requirements imposed under federal and state securities laws and the Company's Code of Conduct, Governance Guidelines, and the Board's Audit Charter;

(c)    Failing to implement, maintain, and monitor adequate internal controls, including adequate and effective disclosure controls; and

(d)    Paying or causing the Company to pay themselves and the Officer Defendants annual compensation while in breach of their fiduciary duties, which also included share-based compensation awarded at share prices that were artificially inflated by their misconduct.

223.    The Director Defendants that were members of the Audit Committee further breached their duties by approving or otherwise allowing the improper statements, which they knew or were reckless in not knowing omitted material facts and contained material misstatements. The Audit Committee Defendants also completely and utterly failed in their duty of oversight and failed to properly oversee Lordstown's (i) compliance with legal and regulatory requirements, (ii) public disclosure controls and procedures, (iii) risk assessment and management, and (iv) internal control functions.

224.    The Director Defendants that are also Proxy Defendants breached their fiduciary duties by approving the Merger on the terms agreed to and later approved by DiamondPeak's stockholders.  Defendants Hamamoto, Walsh, Richardson, Hash, and Hannaway breached their fiduciary duties by failing to perform sufficient due diligence prior to approving the Merger and by recommending that DiamondPeak stockholders vote in favor of the Merger.

225.     As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Lordstown has sustained significant damages.  Accordingly, the Director Defendants are liable to the Company.

226.     In addition, each of the Director Defendants had actual knowledge of the Individual Defendants' breaches of fiduciary duties, knowingly participated in the breaches, and Lordstown has sustained significant damage as a result.  Accordingly, the Director Defendants are further liable to the Company for aiding and abetting their fellow defendants' breaches.

227.     Plaintiffs, on behalf of Lordstown, have no adequate remedy at law.

## COUNT V

### Insider Selling
### (Against the Defendants Rodriguez, Schmidt, and Hamamoto)

228.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

229.     At the time Rodriguez, Schmidt, and Hamamoto sold their Lordstown stock, they knew the undisclosed information described herein and sold such stock on the basis of such information.   That information was material adverse, nonpublic information concerning the Company's business, operations, and prospects.  It was an asset belonging to the Company which Rodriguez, Schmidt, and Hamamoto used for their own benefit when they sold Lordstown stock.

230.     At the time of their stock sales, Rodriguez, Schmidt, and Hamamoto knew the truth about the Company's business, operations, and prospects.  These stock sales while in possession and control of this material adverse, nonpublic information was a breach of their fiduciary duty of loyalty and good faith.

231.     By reason of the foregoing, Lordstown was damaged.

232.    Since the use of the Company's nonpublic information for their own gain constitutes a breach of fiduciary duty, the Company is entitled to the imposition of a constructive trust on any profits that Rodriguez, Schmidt, and Hamamoto retained thereby.

233.    Plaintiffs, on behalf of Lordstown, have no adequate remedy at law.

## COUNT VI

### Unjust Enrichment
### (Against the Individual Defendants)

234.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

235.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Lordstown.  The Individual Defendants were unjustly enriched as a result of the compensation and officer and director remuneration they received while breaching their fiduciary duties.

236.    Defendants Rodriguez, Schmidt, and Hamamoto sold Lordstown stock while in possession of material, adverse nonpublic information that artificially inflated the price of Lordstown stock.  As a result, Rodriguez, Schmidt, and Hamamoto profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

237.    Plaintiffs, as stockholders and representatives of Lordstown, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

238.    Plaintiffs, on behalf of Lordstown, have no adequate remedy at law.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Finding that a stockholder demand on the Demand Board would have been a futile and useless act;

B.      Finding that the Individual Defendants violated the federal securities laws, breached their fiduciary duties to the Company, and were unjustly enriched;

C.      Directing Lordstown to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lordstown and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to appropriately test, and then strengthen, the Company's internal-operational control functions;

- a proposal to appropriately test, and then strengthen, the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public;

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

- a proposal to require an independent Chairman of the Board;

- a proposal to declassify the Board; and

- a proposal to permit the stockholders of Lordstown to nominate three candidates for election to the Board.

D.      Against each of the Individual Defendants in favor of Lordstown for the amount of damages sustained by Lordstown (and its predecessor company), jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

74

E.      Requiring the Individual Defendants to return to Lordstown all compensation and remuneration of whatever kind paid to them by Lordstown (or its predecessor company) during the time that they were in breach of the fiduciary duties;

F.      Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Lordstown's directors, officers, and employees do not engage in wrongful or illegal practices;

G.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

H.      Awarding to Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.      Granting such other and further relief as this Court deems just and equitable.

## XII.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: August 27, 2021

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*

Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3800
bbennett@coochtaylor.com

*Liaison Counsel for Plaintiffs and Attorneys for Plaintiffs Daniel J. Cohen, David M. Cohen, Alicia Kelly, and Herbert Stotler*

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101

MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

*Co-Lead Counsel for Plaintiffs and Attorneys for*
*Plaintiffs Daniel J. Cohen and David M. Cohen*

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
bsachsmichaels@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
rprongay@glancylaw.com
prajesh@glancylaw.com

*Co-Lead Counsel for Plaintiffs and Attorneys for*
*Plaintiffs Alicia Kelley and Herbert Stotler*

**ANDREWS & SPRINGER LLC**
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Telephone: (302) 504-4957
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com
dsborz@andrewsspringer.com

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
Benny C. Goodman III

76

Erik W. Luedeke
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058
BennyG@rgrdlaw.com
ELuedeke@rgrdlaw.com

**ROBBINS LLP**
Brian J. Robbins
Craig W. Smith
Shane P. Sanders
Emily R. Bishopo
5040 Shoreham Place
San Diego, CA  92122
Telephone: (619) 525-3990
brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com
ebishop@robbinsllp.com

*Attorneys for Plaintiff Claude L. Patterson*

**BIELLI & KLAUDER, LLC**
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557
rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Correy Kamin
Ryan Messina
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363.7500
Facsimile: (212) 363.7171
gnespole@zlk.com
ckamin@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Evaristo Sarabia*